# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 3:21CR220 (VAB) |
| | ) | |
| | ) | July 7, 2022 |
| MAHESH PATEL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF OF *AMICUS CURIAE* AMERICAN STAFFING ASSOCIATION**
**IN SUPPORT OF**
**<u>DEFENDANTS' JOINT MOTION TO DISMISS THE INDICTMENT</u>**

**<u>TABLE OF CONTENTS</u>**

**Page**

INTEREST OF *AMICUS CURIAE* ..........................................................................1

INTRODUCTION .................................................................................................2

ARGUMENT ........................................................................................................3

I.      Staffing Firms Provide Procompetitive Benefits That Are Enhanced When Staffing Firms Working For A Shared Client Coordinate On Hiring...............................3

II.     Hiring Coordination Between Staffing Firms At A Shared Client Is Not *Per Se* Illegal. ...........................................................................................................8

      A.     There Is Insufficient Experience Of Anticompetitive Effects To Warrant *Per Se* Treatment. ...........................................................................8

      B.     Procompetitive Hiring Coordination Between Staffing Firms At A Shared Client Is An Intrabrand Restraint Subject To The Rule Of Reason. ...................10

      C.     Shared-Client Hiring Coordination Is Ancillary To Legitimate Staffing Agreements. ...........................................................................................15

III.    Courts Applying The Rule Of Reason Have Determined That Hiring Coordination Is Not Anticompetitive. ...........................................................................18

IV.    Criminalizing The Conduct At Issue Here Would Chill Procompetitive Conduct. ..........19

CONCLUSION..................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arrington v. Burger King Worldwide, Inc.*,
    448 F. Supp. 3d 1322 (S.D. Fla. 2020) ............................................................13

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    9 F.4th 1102 (9th Cir. 2021)...................................................... 15, 16, 18

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    No. 17-cv-205, 2020 WL 2553181 (S.D. Cal. May 20, 2020) ...........................................16

*Conrad v. Jimmy John's Franchise, LLC*,
    No. 18-cv-00133-NJR, 2021 WL 3268339 (S.D. Ill. July 30, 2021) ............................. 12, 13

*Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*,
    720 F.2d 1553 (11th Cir. 1983)..........................................................7

*Cont'l T.V., Inc. v. GTE Sylvania, Inc.*,
    433 U.S. 36 (1977) .......................................................... 9, 10, 13

*Copperweld Corp. v. Independence Tube Corp.*,
    467 U.S. 752 (1984) .............................................................13

*Copy-Data Sys., Inc. v. Toshiba Am., Inc.*,
    663 F.2d 405 (2d Cir. 1981).................................................... 10, 11

*Danforth & Assocs., Inc. v. Caldwell Banker Real Estate, LLC*,
    No. C10-1621, 2011 WL 338798 (W.D. Wash. Feb. 3, 2011)...........................................13

*Deslandes v. McDonald's USA, LLC*,
    No. 17-cv-4857, 2021 WL 3187668 (N.D. Ill. July 28, 2021) ....................................... 7, 16

*Eichorn v. AT&T Corp.*,
    248 F.3d 131 (3d Cir. 2001)......................................................17

*Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*,
    129 F.3d 240 (2d Cir. 1997).....................................................14

*Hertz Corp. v. City of New York*,
    1 F.3d 121 (2d Cir. 1993) .................................................... 9, 10

*HR Staffing Consultants LLC v. Butts*,
    627 F. App'x 168 (3d Cir. 2015)...................................................8

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ....................................................................................9, 10, 11, 13

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)....................................................................................9

*Nat'l Soc'y of Prof'l Eng'rs v. United States*,
  435 U.S. 679 (1978) ................................................................................................9

*nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*,
  No. 1:11-cv-3728, 2012 WL 13009231 (N.D. Ga. July 24, 2012).......................14

*NYNEX Corp. v. Discon, Inc.*,
  525 U.S. 128 (1998) ..............................................................................................19

*Ogden v. Little Caesar Enters., Inc.*,
  393 F. Supp. 3d 622 (E.D. Mich. 2019)...........................................................12, 13

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
  776 F.2d 185 (7th Cir. 1985)......................................................................7, 16, 18

*Risinger v. SOC LLC*,
  708 F. App'x 304 (9th Cir. 2017)...........................................................................1

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
  792 F.2d 210 (D.C. Cir. 1986) ..............................................................................15

*State Oil Co. v. Khan*,
  522 U.S. 3 (1997) ....................................................................................................8

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ................................................................................................8, 9

*Thomsen v. Western Elec. Co.*,
  680 F.2d 1263 (9th Cir. 1982)...............................................................................13

*Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*,
  530 F.3d 204 (3d Cir. 2008)................................................................................9, 14

*United States v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972) ...........................................................................................9, 10

*Williams v. I.B. Fischer Nevada*,
  999 F.2d 445 (9th Cir. 1993)................................................................................13

**Other Authorities**

II Phillip E. Areeda et al., Antitrust Law (3d ed. 2007) ......................................8

iii

ASA, 2020 STAFFING OPERATIONS BENCHMARKING SURVEY .......................................................4

ASA & CLEARLYRATED, 2020 CANDIDATE SENTIMENT STUDY .................................................3, 4

ASA, CAREERBUILDER & CLEARLYRATED, 2022 STAFFING BUYER STUDY ..........................5, 6

DOJ & FTC, ANTITRUST GUIDANCE FOR HUMAN RESOURCE PROFESSIONALS (Oct. 2016),
    available at https://www.justice.gov/atr/file/903511/download ...........................................15

*2021 Employer Health Benefits Survey*, KAISER FAMILY FOUNDATION (Nov. 10, 2021),
    available at https://www.kff.org/report-section/ehbs-2021-summary-of-findings/..................4

**Other**

Mem. Op. & Order, *Deslandes v. McDonald's USA, LLC*,
    No. 17-cv-4857 (N.D. Ill. June 28, 2022), Dkt. 453 ............................................... 16, 17, 18

## INTEREST OF *AMICUS CURIAE**

The American Staffing Association ("ASA") submits this *amicus* brief in support of Defendants' motion to dismiss the indictment.  Founded in 1966, ASA is the largest trade association for the staffing industry, and the leading voice in the country for staffing, recruiting, and workforce solutions firms.  ASA promotes and protects the interests of staffing firms and the temporary and contract employees they employ.

ASA represents more than 1,300 staffing firms, which operate over 12,000 offices throughout the United States.  ASA provides staffing-industry information to lawmaking bodies, educates the public and its members about applicable laws and regulations, fosters understanding of the industry and its beneficial role in the economy, encourages ethical business conduct, and offers educational updates to members about the staffing industry.  ASA is intimately familiar with the challenges its members face complying with both federal and state antitrust laws.  ASA participates as *amicus curiae* in cases involving vital staffing industry issues, including this case. *See, e.g.*, *Risinger v. SOC LLC*, 708 F. App'x 304 (9th Cir. 2017).

This criminal matter represents a novel attempt to apply antitrust law's harshest sanction—the *per se* rule—to hiring coordination between a shared client and its outsourcing firms.  Just like the outsourcing firms here, multiple staffing firms often work for a shared client and, as a result, there may be procompetitive limits on solicitation and hiring of employees working on projects for that client.  Because such conduct has clear procompetitive virtues, ASA respectfully submits that it should be addressed, if at all, under the rule of reason.

---

[*] No counsel for a party authored this brief in whole or in part.  No party, no counsel for a party, and no person other than *amicus* made a monetary contribution intended to fund the preparation or submission of this brief.

## INTRODUCTION

Staffing firms—like the outsourced engineering services firms here—serve a vital and procompetitive role in the economy.  Their work benefits both businesses and workers.  Because of staffing firms, more workers are placed in jobs, workers receive better on-the-job training, and workers have increased opportunities to try different jobs until they find the right fit.  When multiple staffing firms provide services to the same client, procompetitive hiring coordination enables staffing firms to best deliver these advantages to the shared client and employees.

Yet the Government seeks to criminalize this procompetitive hiring coordination.  That conduct, the Government alleges, is *per se* illegal.  The default rule for determining whether conduct violates the antitrust laws, however, is the rule of reason, which analyzes and then balances a practice's procompetitive benefits against its anticompetitive effects.  Meanwhile, conduct subject to the *per se* rule is treated as automatically illegal without such an analysis.  For that reason, the *per se* rule is reserved only for conduct that has no redeeming virtues whatsoever.

Procompetitive hiring coordination among staffing firms and a shared client does not fall into that bucket.  Courts have repeatedly recognized that hiring coordination in similar circumstances has procompetitive benefits and should as a consequence be analyzed under the rule of reason.  Indeed, such conduct is essentially a vertically-motivated intrabrand restraint—a way to enhance the client's competitiveness in the broader market by incentivizing staffing firms to strengthen their hiring programs for that client.  To the extent the conduct is instead viewed as primarily horizontal, it is ancillary to the legitimate staffing agreements.  Either way, the conduct is subject to the rule of reason.  Moreover, courts have found that such coordination is not only unlikely to cause anticompetitive effects, but has clear procompetitive justifications.

This Court should not permit the Government to criminally prosecute the sort of coordination at issue here—conduct that may, on balance, be procompetitive. Subjecting such conduct to the *per se* rule would risk chilling procompetitive coordination among staffing agencies working for a shared client and foreclosing the benefits that follow. Worse, criminalizing this conduct poses disintermediation risks that threaten the effective functioning of the staffing industry at large. Accordingly, the conduct here should be analyzed under the rule of reason, if at all, and the Indictment dismissed.

## ARGUMENT

### I.   Staffing Firms Provide Procompetitive Benefits That Are Enhanced When Staffing Firms Working For A Shared Client Coordinate On Hiring.

Staffing firms provide a myriad of procompetitive benefits to job seekers and businesses. Those benefits are also achieved when staffing firms serving a shared client coordinate on hiring.

As an initial matter, staffing firms are an efficient mechanism for employees to find work. Many employees prefer to have a centralized resource for job placement of the sort offered by staffing firms. According to a 2020 study of job candidates ASA conducted with research firm ClearlyRated, many job seekers prefer the staffing firm model over applying to jobs themselves.[1] For good reason—staffing firms are often well-attuned to significant opportunities that may be hard to find for candidates on their own; 50% of candidates that used a staffing firm cited either the firm's "access to jobs" or the firms' "understand[ing of] the employment market" as the "driving force" for using the firm.[2] And staffing firms deliver on

---

[1]  ASA & CLEARLYRATED, 2020 CANDIDATE SENTIMENT STUDY at 19.

[2]  *Id.* at 57.

that promise—55% of those who used a staffing firm planned to use the same firm again in the future; only 14% suggested they would not.[3]

Employees further benefit from staffing firms' personalized training opportunities and placement expertise.  Staffing firm training begins prior to assignment to the client: 69% of candidates reported that their staffing firm "[w]orked to get to know me as a person" and 66% reported that the firm "[h]elped me prepare for [an] interview."[4]  And the support continues throughout the employee's work with the client: 84% reported that the position was accurately described prior to start, 80% reported that issues while at the client were resolved promptly, 67% reported that they were contacted prior to end of the assignment, and 55% reported that they received feedback and coaching during the assignment.[5]  Moreover, staffing firms often provide significant direct benefits throughout that process: for instance, a 2020 ASA benchmarking survey of its members revealed that 82% of staffing firms offer health insurance, well above the 59% average for all industries.[6]  In short, staffing firms provide meaningful—and lasting—benefits to their employees.

For similar reasons, clients also value staffing firms' ability to find talented workers. According to a May 2022 study ASA conducted with employment website CareerBuilder and research firm ClearlyRated, 66% of client hiring managers planning to increase their use of staffing firms intended to do so in part because their staffing firm "has been really effective at

---

[3]  *Id.* at 64.

[4]  *Id.* at 66.

[5]  *Id.* at 67.

[6]  ASA, 2020 STAFFING OPERATIONS BENCHMARKING SURVEY at 17; *see 2021 Employer Health Benefits Survey*, KAISER FAMILY FOUNDATION (Nov. 10, 2021) (identifying that only 59% of companies offer health benefits), available at https://www.kff.org/report-section/ehbs-2021-summary-of-findings/.

finding the talent [the manager] need[s]."[7]  And over 80% of hiring managers rate their primary staffing firm as good or very good at tasks like finding candidates, providing a good quantity of candidates, and matching candidates' skills to client requirements.[8]  Staffing firms are, in other words, adept at finding and developing quality candidates that fit well with client needs.

Indeed, clients generally view staffing firms as more effective than their own internal recruiting efforts across virtually all hiring dimensions.  The same May 2022 survey confirms as much.  On a scale of 0 to 100, with scores above 50 reflecting an aggregate belief that a staffing firm does a task better than internal client processes, client hiring managers rated staffing firms as more effective than their own firms at:

- Accessing candidates with specialized skills (72);
- Quickly sourcing potential candidates (71);
- Recruiting expertise (68);
- Sourcing candidates from diverse backgrounds (68);
- Providing quality candidates (66);
- Time to hire (66);
- Flexibility in changing the number or mix of workers based on project load (64);
- Cost effectiveness (54); and
- Finding candidates that fit culture (52).[9]

These comparative advantages likewise help clients address the "pain points" hiring managers face within their organization.  For instance, 66% of hiring managers view their "access to candidates with the right skills" as a pain point, and 90% say that staffing firms are either

---

[7]  ASA, CAREERBUILDER & CLEARLYRATED, 2022 STAFFING BUYER STUDY at 8.

[8]  *Id.* at 13.

[9]  *Id.* at 9.

"helpful" or "very helpful" in addressing that concern.[10]  Similar statistics play out with factors like time to hire (61% of managers feel that this is an organizational pain point; 89% think staffing firms are helpful or very helpful in addressing), internal hiring processes (50% find it a pain point and 81% think staffing firms help address it), handling remote work (48% find it a pain point and 87% think staffing firms help address it), hiring diverse candidates (46% find it a pain point and 92% think staffing firms help address it), and dealing with limitations on current technology (37% find it a pain point and 82% think staffing help address it).[11]

Staffing firms can provide those same procompetitive benefits where there are multiple staffing firms servicing the same shared client.  Such a shared-client dynamic is not unusual, and there are intuitive reasons for its existence.  As an example, a lone staffing firm might be unable to meet client demand on its own, either at a given moment in time or on a more permanent basis.  Or a client might simply want different firms to staff its different lines of business. Whatever the cause for a shared-client arrangement, the underlying goals that employees and clients have for their staffing firms remain the same: all involved want quality hiring and training services from their staffing firms.  Satisfying those aims in shared-client settings necessarily benefits employees and clients alike.

---

[10]  *Id.* at 23.

[11]  *Id.*

But the benefits staffing firms provide to employees and clients would be threatened if staffing firm coordination at shared clients was *per se* illegal.  Whether at shared clients or not, staffing firms devote considerable resources to identifying, hiring, onboarding, training, and supporting the employees they place.  But those efforts naturally face a significant free-rider problem in the shared-client context: other staffing firms (or the client itself) could exploit any given firm's employee-focused investments—most obviously by focusing on recruiting away employees at the same shared client rather than improving their own programs.  *See, e.g.*, *Deslandes v. McDonald's USA, LLC*, No. 17-cv-4857, 2021 WL 3187668, at *6–9 (N.D. Ill. July 28, 2021) (explaining how, absent hiring coordination, "other outlets will free-ride on this training by hiring away employees trained in [a particular manner]").  The risk, in other words, is that one or more entities decide *not* to invest in outward-facing recruitment efforts or *not* to provide value-adding training and instead simply recruit workers already placed at the shared client by another staffing firm after that firm has provided such benefits.  That dynamic has a self-evident downside: it would disincentivize all staffing firms serving the client from investing in recruitment and training in the first place.

Procompetitive hiring coordination, by contrast, incentivizes the staffing firms to attract new candidates, motivating each to invest in these efforts and build recruiting and training expertise without fear of "cutting [its] own throat." *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985).  That likewise allows the firms to maintain the significant benefits they generally seek to offer to workers and clients.  As a consequence, procompetitive hiring coordination plays a key role in preventing disintermediation—that is, in ensuring that staffing firms remain viable, efficiency-enhancing platforms placing employees with businesses. *See Consultants & Designers, Inc. v. Butler Serv. Grp., Inc.*, 720 F.2d 1553, 1558–59 (11th Cir.

1983) (concluding that a "covenant between [defendants] not to hire one another's employees" was "clearly crafted" to protect a company from "the ravages of opportunistic disintermediation"); *HR Staffing Consultants LLC v. Butts*, 627 F. App'x 168, 172 (3d Cir. 2015) ("[B]ecause the non-compete helps prevent disintermediation, enforcing it is reasonable."). Such coordination is therefore decisively procompetitive.

## II.   Hiring Coordination Between Staffing Firms At A Shared Client Is Not *Per Se* Illegal.

Given its benefits, the *per se* rule is inappropriate to address procompetitive hiring coordination between staffing firms at a shared client. The Government cannot show the sort of routine experience with such conduct to justify that treatment. Rather, as various analogous cases demonstrate, these sorts of hiring arrangements are subject to the rule of reason as intrabrand restraints or otherwise as ancillary restraints.

### A.   There Is Insufficient Experience Of Anticompetitive Effects To Warrant *Per Se* Treatment.

Rule of reason is the default mode of antitrust analysis. *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997); *see* II PHILLIP E. AREEDA ET AL., ANTITRUST LAW, ¶ 305e at 68 (3d ed. 2007). "[M]ost antitrust claims" fall under that umbrella. *Khan*, 522 U.S. at 10. For good reason, the rule of reason is the best suited to evaluating the complexities of modern business arrangements. That is because the rule of reason carefully parses the actual competitive effects of the alleged conduct with reference to a "variety of factors," such as "specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect." *Id.* So, given the rule of reason's analytical rigor, courts "presumptively appl[y]" that standard unless the challenger of the alleged conduct demonstrates that the stricter *per se* rule applies. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006).

Challengers face a heavy burden to get *per se* treatment.  Because that approach functionally short-circuits the standard market analyses central to any antitrust claim, the *per se* rule is appropriate only when courts have "considerable experience" that the specific challenged "business relationship[]" is categorically anticompetitive.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 607–08 (1972); *Dagher*, 547 U.S. at 5 (emphasizing that the *per se* rule is appropriate only when the conduct is "so plainly anticompetitive" that "no elaborate study . . . is needed to establish [its] illegality" (quoting *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978))).  To reach that level of certainty, courts must rely on a history of "demonstrable economic effect[s]" rather than on "formalistic line drawing."  *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 887 (2007) (quoting *Cont'l T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 59 (1977)).  That means, in the words of the Second Circuit, that "[p]er se treatment is not appropriate . . . where the economic and competitive effects of the challenged practice are unclear."  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008).

Restraints with potential procompetitive benefits get rule of reason treatment.  *Leegin*, 551 U.S. at 889–92; *e.g.*, *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 225 (3d Cir. 2008).  There is a good reason for that: the rule of reason is attuned to the challenged conduct's possible procompetitive effects.  The *per se* rule, by contrast, is more bludgeon than scalpel—especially when applied criminally.  It allows the Government to skip otherwise vital market analyses and impose criminal sanctions largely just off the mere existence of an agreement regardless of its actual competitive effects.  That can deter—rather than encourage—procompetitive conduct.  The *per se* rule is therefore, quite sensibly, reserved for the "relatively narrow circumstance" where the alleged conduct "lacks any redeeming virtue."  *Hertz*

9

*Corp. v. City of New York*, 1 F.3d 121, 129 (2d Cir. 1993).  If there is a possibility the challenged conduct might produce efficiencies—even if, after careful analysis, those benefits might be ultimately outweighed by inefficiencies—the rule of reason is the proper framework.  *Id.*

As discussed above, there is likely to be procompetitive effects in shared-client hiring coordination between staffing firms.  That means, quite plainly, there is some obvious redeeming value here.  *Id.*  So, far from a "considerable experience" that this conduct is anticompetitive, there is strong reason to suspect that such coordination is ordinarily procompetitive on net. *Topco Assocs.*, 405 U.S. at 607–08.  And in fact, no court has concluded that coordination between staffing firms at a shared client is anticompetitive, let alone categorically so.  Hence, the *per se* rule is inappropriate.

> **B.**     **Procompetitive Hiring Coordination Between Staffing Firms At A Shared Client Is An Intrabrand Restraint Subject To The Rule Of Reason.**

A wealth of authority supports the rule of reason as the proper way to address procompetitive hiring coordination between staffing firms at the same client.  Such coordination is best characterized as an *intra*brand limitation designed to enhance the client's *inter*brand competitiveness.  Under well-established precedent, intrabrand restraints are subject to the rule of reason.  The rule of reason therefore applies to hiring coordination in this space.

Many procompetitive restraints involve limits on *intra*brand competition—that is, in reducing competition for a given product or service to enhance that product or service's competitive strength in the broader *inter*brand marketplace.  *Leegin*, 551 U.S. at 889–92.[12] *Leegin* provides one classic example: a manufacturer setting minimum resale prices that its

---

[12]   "Intrabrand competition is competition among purveyors of the product of a particular manufacturer."  *Copy-Data Sys., Inc. v. Toshiba Am., Inc.*, 663 F.2d 405, 409 n.4 (2d Cir. 1981) (citing *GTE Sylvania*, 433 U.S. at 52 n.19).  "Interbrand competition is competition among sellers of various brands of the same generic product."  *Id.*

downstream retailers could charge for the manufacturers' products. *Id.* While in some sense a form of (literal) price-fixing, the Court concluded that such conduct was properly addressed only under the rule of reason because it procompetitively encouraged the retailers to promote the products against those of the manufacturer's competitors. *Id.*

As in *Leegin*, intrabrand restraints are often used by vertically-situated[13] entities seeking to limit how its suppliers or distributors compete with each other when promoting the vertical entity's interests. *Id.* In that setting, market or price restrictions can encourage the upstream or downstream parties to "invest in tangible or intangible services or promotional efforts that aid the [vertical entity]'s position as against rival[s]." *Id.* at 890. Banning such restraints under the *per se* rule could eliminate those benefits: absent coordination, the horizontally-situated parties would be incentivized to "free ride" off of each other's promotional or training efforts. *Id.* Given the potential benefits to the intrabrand restraints and potential harms to proscribing them, antitrust law applies the rule of reason. *Id.*

Procompetitive hiring coordination between staffing firms at a shared client is best understood as a form of intrabrand restraint motivated by the needs of the vertically-situated shared client to enhance its marketplace competitiveness by maximizing the training and skill of the employees supplied to it by staffing firms. This objective would be undermined by unrestrained free-riding among those suppliers. Similarly, there are clear procompetitive justifications in allowing coordination between the staffing firms as a way to promote expansion of recruiting and training opportunities while limiting free ridership.

---

[13]   Entities are vertically situated from each other when they exist at different levels of a market or supply chain, as with manufacturers and retailers. *Copy-Data*, 663 F.2d at 408. By contrast, entities are horizontally situated when they are "at the same level of the market"—that is, when they directly compete with each other in the sale of some good or service. *Id.*

Perhaps the closest parallel to procompetitive hiring coordination by staffing firms comes from the franchising context.  Hiring coordination in that space is a classic form of intrabrand restraint.  *See, e.g.*, *Conrad v. Jimmy John's Franchise, LLC*, No. 18-cv-00133-NJR, 2021 WL 3268339, at \*10–11 (S.D. Ill. July 30, 2021); *Ogden v. Little Caesar Enters., Inc.*, 393 F. Supp. 3d 622, 634–35 (E.D. Mich. 2019).  In franchising (as in staffing), a vertically-situated entity delegates core activities to legally distinct franchisee entities (like restaurant operators) that are themselves horizontally-situated with other franchisees.  Those franchisees have essentially two possible modes of competition.  They can compete (*intra*brand) with their "sister" franchisees operating under the same vertical entity (one Jimmy John's franchise trying to beat out another Jimmy John's franchise).  Or they can compete (*inter*brand) against different brands operating under other vertical entities (a Jimmy John's franchise trying to beat out a Subway franchise).

Franchisors—like staffing firm clients—have a strong procompetitive incentive to encourage their various franchisees to limit intrabrand competition and focus on interbrand competition.  Coordination on subjects like hiring promotes those ends by incentivizing the franchisees to provide recruiting, training, or other development opportunities for their employees.  *Conrad*, 2021 WL 3268339, at \*10 ("[M]ost [employees] likely *benefited* from the No-Poach Provision because it gave franchisees an added incentive to provide more training, thus promoting employee advancement." (emphasis in original)); *Ogden*, 393 F. Supp. 3d at 634 (dismissing claim against franchisee no-hire restrictions because they could promote interbrand

12

competition).[14]   Those benefits are naturally procompetitive: employees get more skills and the vertically-situated entity has a better-trained workforce attuned to its business needs.   So such coordination gets treated under the rule of reason as an intrabrand restraint and not under the *per se* rule.  *See Conrad*, 2021 WL 3268339, at *10; *Ogden*, 393 F. Supp. 3d at 634–35.

Similar dynamics play out with other analogous arrangements, all of which are also subject to rule of reason.   Vertically-situated entities—like the clients of staffing agencies—can, for instance, allocate markets or set prices at other levels of the supply chain.   *Leegin,* 551 U.S. at 890.   Such conduct can "stimulate interbrand competition" by "reducing intrabrand competition," shifting downstream entities' focus towards extolling the virtues of the brand more broadly.  *Id.*  In fact, that tradeoff is ordinarily procompetitive on net, in large part because "[t]he degree of intrabrand competition is wholly independent of the level of interbrand competition confronting the manufacturer."  *GTE Sylvania*, 433 U.S. at 52 n.19.

---

[14]  For similar reasons, courts have sometimes concluded that franchisors are facially incapable of conspiring with their franchisees because they are functionally acting as the same entity promoting the franchisors' interests.  *See Arrington v. Burger King Worldwide, Inc.*, 448 F. Supp. 3d 1322, 1331–32 (S.D. Fla. 2020) (concluding that a franchisor's required no-hire agreements between franchisees were non-actionable because they constituted "an 'internal agreement to implement a single, unitary firm's policies'" (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984))); *see Williams v. I.B. Fischer Nevada*, 999 F.2d 445, 447 (9th Cir. 1993) (per curiam) (same because the franchisor and franchisee were a "common enterprise" (quoting *Thomsen v. Western Elec. Co.*, 680 F.2d 1263, 1266–67 (9th Cir. 1982))); *see also Danforth & Assocs., Inc. v. Caldwell Banker Real Estate, LLC*, No. C10-1621, 2011 WL 338798, at *2 (W.D. Wash. Feb. 3, 2011) ("[C]oordinated activity between a franchisor and a franchisee does not implicate the Sherman Act").  Similar considerations would tend to apply in many staffing contexts, in which staffing firms are often tasked with implementing their client's hiring policies.

Indeed, the same is true even where the vertical entity also competes in the same market, as in the dual distribution setting.  The rule of reason is typically appropriate there, too.  *Elecs. Commc'ns Corp. v. Toshiba Am. Consumer Prods., Inc.*, 129 F.3d 240, 243–44 (2d Cir. 1997) (collecting cases and emphasizing that rule of reason treatment is appropriate "even if the distributor and manufacturer also compete at the distribution level, where, as here, the manufacturer distributes its products through a distributor and independently"); *Toledo Mack*, 530 F.3d at 225 ("The rule of reason analysis applies even when, as in this case, the plaintiff alleges that the purpose of the vertical agreement between a manufacturer and its dealers is to support illegal horizontal agreements between multiple dealers.").  The reason: the vertical entity might capture "efficiency-creating integration" in one segment while still procompetitively delegating some other segment to a downstream entity.  *E.g.*, *nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 1:11-cv-3728, 2012 WL 13009231, at *6–7 (N.D. Ga. July 24, 2012) (dismissing claim challenging blended vertical-and-horizontal conduct).  That explanation is not, by contrast, true for purely horizontal competitor-to-competitor coordination, where there is definitionally no integration rationale for the competitors to handle different segments.  The upshot is that the presence of a vertically-situated entity alone ordinarily puts a case beyond the *per se* rule.

Procompetitive hiring coordination at a shared client fits neatly in line with these intrabrand restraint cases.  It limits self-defeating cross-hiring between staffing firms while incentivizing the sort of recruiting, training, and other opportunities that make employees and clients more competitive in the broader market.  Those are decidedly procompetitive justifications.  Rule of reason treatment is therefore warranted here.

14

### C.      Shared-Client Hiring Coordination Is Ancillary To Legitimate Staffing Agreements.

Hiring coordination between staffing firms at a shared client also is subject to rule of reason as an ancillary restraint.

Otherwise prohibited restrictions that are "ancillary" to legitimate transactions get rule of reason treatment—only "naked" restraints get the *per se* rule. *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109–10 (9th Cir. 2021); *see also Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 224 (D.C. Cir. 1986). Specifically, courts permit restraints that are "(1) subordinate and collateral to a separate, legitimate transaction," and "(2) reasonably necessary to achieving that transaction's pro-competitive purpose." *Aya*, 9 F.4th at 1109–10 (internal quotation marks and citations omitted). The rationale for doing so is similar to the justifications for intrabrand restraints: limiting associated entities from competitively harming themselves when they enter collaborative arrangements can facilitate their joint ability to compete against others in the broader marketplace. *See id.* So ancillary restraints also warrant more detailed analysis under the rule of reason.

Hiring coordination can be—and often is—ancillary to other (often vertically-directed) agreements. In fact, the Government has issued guidance saying just that. According to the Government, hiring coordination is not subject to the *per se* rule whenever "reasonably necessary to a larger legitimate collaboration between the employers." DOJ & FTC, ANTITRUST GUIDANCE FOR HUMAN RESOURCE PROFESSIONALS at 3 (Oct. 2016), available at https://www.justice.gov/atr/file/903511/download. And such ancillary hiring coordination likewise falls beyond the sort of conduct that the Government will pursue criminally. *Id.* at 8. For good reason: it can facilitate the advancement of the underlying procompetitive agreement.

The Ninth Circuit's decision in *Aya*—which, like this case, involves staffing firms—is instructive.  In *Aya*, the Ninth Circuit concluded that a no-hire agreement between a hospital staffing firm and a subcontractor staffing firm used to supplement its temporary nursing services was an ancillary restraint.  According to the court, the restraint was subordinate and collateral to the parties' legitimate agreement "to supply hospitals with traveling nurses" and was "necessary" to achieving that goal "because [the no-hire agreement] ensures that [the agency] will not lose its personnel during the collaboration."  *Aya*, 9 F.4th at 1109–10.  If the two entities did not so coordinate, the staffing firm would be "less willing or unwilling" to meet client demand.  *Id.* at 1110 (quoting *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-cv-205, 2020 WL 2553181, at *14 (S.D. Cal. May 20, 2020)).  But with ancillary hiring coordination, the firms could "collaborate . . . for the benefit of [their client] without 'cutting [their] own throat.'"  *Id.* (quoting *Polk Bros.*, 776 F.2d at 189).  Thus, the no-hire agreement was ancillary to the legitimate staffing agreement.  *Id.*  It was therefore subject to a rule of reason analysis even though it in some sense allocated employees between firms.  *Id.*

Perhaps unsurprisingly, at least one of the franchising cases has reached a similar conclusion: franchisor-directed hiring restrictions are generally reasonably necessary to effectuate the vertical franchise agreements by preventing free-riding between franchisees. *Deslandes*, 2021 WL 3187668, at *6–8 (concluding that a franchisor's imposition of no-hire agreements between franchisees was an ancillary restraint subject to rule of reason analysis because those agreements were attendant to plainly legitimate franchise agreements); *see* Mem.

16

Op. & Order, *Deslandes v. McDonald's USA, LLC*, No. 17-cv-4857 (N.D. Ill. June 28, 2022),
Dkt. 453 (granting judgment for the defendants on claims challenging those arrangements).[15]

Given the close parallels between the franchising setting and the staffing firm setting,
these rationales further suggest that rule of reason treatment is appropriate for hiring
coordination between staffing firms at a shared client.  For example, limiting the disruption of
employees moving between firms incentivizes all involved to invest in outward-facing
recruitment efforts and employee training.  That sort of agreement therefore facilitates—
strongly—the parties' respective agreements with the shared client.  Put simply, it makes sure
that the firms can, in fact, provide the employees the client needs.  Without such coordination,
they would be less able to meet client demand on potentially all of the broad services they are
expected to provide.  That effect makes the coordination ancillary to the contracts they have with
the shared client, and therefore subject to the rule of reason.

All that makes sense.  Ancillary hiring coordination can encourage training and other
investments on the part of the horizontal entities (like the staffing firms here).  As Judge
Easterbrook has said about hiring restrictions following the sale of a business:

> A legal rule that enforces covenants not to compete, even after an employee has
> launched his own firm, makes it easier for people to cooperate productively in the
> first place.  Knowing that he is not cutting his own throat by doing so, the
> employer will train the employee, giving him skills, knowledge, and trade secrets
> that make the firm more productive.

---

[15]   Courts in related contexts have likewise held that hiring coordination between affiliated
entities constitute ancillary restraints in service of some common, procompetitive end.  *See, e.g.,
Eichorn v. AT&T Corp.*, 248 F.3d 131, 144–46 (3d Cir. 2001).  Notably, the rule of reason
remains appropriate for such restraints even if there may be some other hypothetical way to
achieve the same efficiencies.  As the Third Circuit identified in *Eichorn*, "the existence of
alternative means to achieve a legitimate business goal does not in itself mean the defendants'
chosen course of action was uncompetitive and improper."  *Id.* at 146 n.3.  To be sure, the
relative virtues of those alternative means may well factor into a rule of reason analysis—but
they do not turn ancillary hiring coordination into a *per se* violation.

*Polk Bros.*, 776 F.2d at 189.  That same analysis applies here.  As a result, such coordination is not—and should not be—*per se* illegal.

## III.   Courts Applying The Rule Of Reason Have Determined That Hiring Coordination Is Not Anticompetitive.

Applying the *per se* rule would be particularly improper because it is not clear that such conduct has anticompetitive effects at all.  Once again, *Aya* illustrates this point.  There, the Ninth Circuit rejected a challenge to hiring coordination at the very first step of the rule of reason analysis because there was neither direct nor indirect evidence of any anticompetitive harm.  9 F.4th at 1111–13.  One reason the court found a lack of harm was there was no sign that the staffing firm held sufficient market power—*i.e.*, alleged "control over the available workflow and plum assignments" was insufficient.  *Id.* at 1112–13.

A recent decision in the franchising setting also shows that hiring coordination lacks anticompetitive effects where it impacts only one segment of the market.  *See* Mem. Op. & Order, *Deslandes v. McDonald's USA, LLC*, No. 17-cv-4857 (N.D. Ill. June 28, 2022), Dkt. 453 (granting judgment on the pleadings on no-poach claims because the plaintiff failed to adequately allege a relevant market in which the employer had market power).  In those circumstances, an employer is just one of many potential workplaces available to the employees.  The result of that dynamic is a lack of any significant anticompetitive effect: "[firms] could not suppress [an employee's] wages; another buyer would step in to pay [the employee] more."  *Id.* at 12.  In short, hiring coordination may not meaningfully affect the employees' employment landscape.

The same considerations are likely to apply in most if not all shared-client staffing firm cases—especially when the client itself directs the alleged coordination.[16]   That analogous cases conclude that this conduct is not anticompetitive even after a full-blown rule of reason analysis makes plain that *per se* treatment is inappropriate here.

## IV.    Criminalizing The Conduct At Issue Here Would Chill Procompetitive Conduct.

Finally, courts should be especially hesitant to apply the *per se* rule where doing so would "discourage" procompetitive conduct.  *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 137 (1998).   That chilling effect would be just the result in this case—especially with criminal sanctions potentially at stake.

Most significantly, criminalizing coordination in this space would harm employees and severely hinder staffing firms' ability to meet client demand.   Clients would be chilled from using more than one staffing firm for fear that any attempts to coordinate who is hiring who would be treated as *per se* illegal.   And a lone staffing firm is not always capable of meeting all of a client's staffing needs on its own.   So, clients would be left short-staffed, even as qualified employees that could alleviate that shortage are kept from plugging the gap.

By contrast, staffing firm coordination on these issues allows the firms to continue providing the procompetitive services their employees and clients expect.   Indeed, such coordination is in many senses central to the ongoing viability of staffing firms as effective and efficient platforms between those two groups—especially as staffing firms face a particular danger of disintermediation, as discussed above.   Without such coordination, many benefits

---

[16]   Naturally, it is impossible to forecast the evidence of competitive effects in every hypothetical rule of reason case in this setting.   But the fact that the most prominent staffing firm decision (*Aya*) and a significant franchising case (*Deslandes*) applied the rule of reason and concluded that the relevant claims failed on the very first step of that analysis strongly suggests that the *per se* rule is definitively the wrong treatment for these cases.

staffing firms provide are put at risk and the net procompetitive effects they engender are threatened.

The bottom-line: procompetitive hiring coordination between staffing firms at a shared client promotes the firms' staffing agreements with the client.  Coordination is reasonably necessary to facilitate those agreements: it allows each firm to keep its employees and, what's more, incentivizes them to provide the full panoply of recruiting, training, and other opportunities described above.  Such coordination is therefore, at worst, an ancillary restraint— likewise subject to the rule of reason.

## **<u>CONCLUSION</u>**

ASA respectfully requests that this Court analyze hiring coordination between staffing firms at their shared client under the rule of reason.  Since the Government has only alleged *per se* claims here, ASA respectfully submits that the Court can and should dismiss the entire Indictment.

Dated: July 7, 2022

Respectfully submitted,

*/s/ Shawn R. Fox*

Shawn R. Fox
Federal Bar No. ct26685
McGUIREWOODS LLP
1251 Avenue of the Americas
20th Floor
New York, New York 10020
Tel.: (212) 548-2100
Fax.: (212) 548-2150
sfox@mcguirewoods.com

Amy B. Manning
(*pro hac vice* forthcoming)
Angelo M. Russo
(*pro hac vice* forthcoming)
Sarah A. Zielinski
(*pro hac vice* forthcoming)
McGUIREWOODS LLP
77 West Wacker, Suite 4100
Chicago, Illinois 60601
Tel.: (312) 849-8100
Fax: (312) 558-4386
amanning@mcguirewoods.com
arusso@mcguirewoods.com
szielinski@mcguirewoods.com

Sean A. McClelland
(*pro hac vice* forthcoming)
McGUIREWOODS LLP
888 16th Street N.W.
Suite 500
Black Lives Matter Plaza
Washington, DC 20006
Tel.: (202) 857-1700
Fax: (202) 857-1737
smcclelland@mcguirewoods.com

*Counsel for Amicus Curiae American
Staffing Association*

## **CERTIFICATE OF SERVICE**

I certify that on July 7, 2022, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Shawn R. Fox*
Shawn R. Fox

*Counsel for Amicus Curiae American Staffing Association*